**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:07-CR-0029** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **AARON DOUGLAS KNILL** | : | |

**MEMORANDUM**

Presently before the court is a motion filed by defendant, Aaron Douglas

Knill, to suppress his oral and written statements and the evidence obtained during

a search of his residence.  For the reasons that follow, the court will deny the

motion.

**I.    Findings of Fact**[1]

On January 18, 2007, defendant was arrested by officers of the Frederick

Maryland Police Department pursuant to a federal arrest warrant issued by

Magistrate Judge J. Andrew Smyser.  (Doc. 55 at 5, 11; Doc. 3.)  The corresponding

complaint charged defendant with bank robbery in violation of 18 U.S.C. § 2113.

(Doc. 1.)  On February 6, 2007, defendant entered a plea of not guilty to the

indictment, which charges defendant with:  (1) armed bank robbery in violation of

18 U.S.C. § 2113(a), (d), and (2) use of a firearm during a crime of violence in

violation of 18 U.S.C. § 924(c).  (Docs. 11, 19).  A superseding indictment, to which

---

[1] These findings are based on testimonial and documentary evidence
presented at the hearing on the motion.  See United States v. Pelullo, 173 F.3d 131,
135-38 (3d Cir. 1999); see also Ornelas v. United States, 517 U.S. 690, 695-98 (1996).
They substantially reflect the testimony given by the law enforcement officers,
which the court credits.

defendant entered a plea of not guilty, added a new count charging defendant with unlawful possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Docs. 32, 43.)  Defendant subsequently filed the instant motion to suppress his oral and written statements as well as evidence obtained during a search of his residence.  The court conducted an evidentiary hearing on the instant motion on May 4, 2007 (Doc. 50) and ordered supplemental briefing (Doc. 48).  The motion has been fully briefed and is ripe for disposition.

A.    **Oral and Written Statements**

On the morning of January 18, 2007, an agent of the Federal Bureau of Investigation ("FBI"), Christopher T. Nawrocki ("Agent Nawrocki") became involved in the investigation of an armed bank robbery at the Mid Penn Bank in Hampden Township, Pennsylvania.  An eyewitness provided information about a suspicious person leaving the bank and entering a vehicle.  Through the license plate supplied by the eyewitness, Agent Nawrocki learned that Enterprise Rent-A-Car ("Enterprise") owned the vehicle, a black Nissan Maxim, and that it was rented from their Frederick, Maryland location by defendant.  Agent Nawrocki contacted the Enterprise location in Frederick and directed them to dial 911 if the vehicle was returned.  (Doc. 55 at 52-55.)

At approximately 5:00 p.m. that day, Agent Nawrocki received a call from Enterprise informing him that the vehicle was at their Frederick location and that

2

the local police department was on its way.  (Id. at 55.)  At the Enterprise location,[2]

defendant attempted to make a payment on the vehicle by check.  The clerk told

defendant that the check was not clearing.  After ten or fifteen minutes, defendant

told the clerk he would get a cashier's check.  When defendant turned to leave the

rental agency, three Frederick police officers entered the agency and requested that

defendant produce identification.  The officers led defendant to believe that they

were there because of an overdue payment on the rental vehicle.  The officers did

not give defendant his Miranda[3] rights and they cleared everyone out of the rental

agency, including the employees.  (Id. at 110-12.)  At some point during questioning

from the officers, defendant informed them that the address of his residence was

1513 Rosemont Avenue in Frederick, Maryland.  (Doc. 61 at 21 n.7.)  During the

time defendant was at the Enterprise rental agency, Agent Nawrocki secured an

arrest warrant for armed bank robbery and faxed it to the Frederick Police

Department.  Defendant was then arrested by the officers at Enterprise.  (Doc. 55 at

55-56, 112.)

    At the Frederick police office, two agents from Frederick's FBI office

informed defendant that he was being charged with bank robbery and asked

---

[2] The government did not offer any testimony from the officers who
encountered defendant at Enterprise.  See infra Part II.A.1.  Therefore, these facts
are merely defendant's allegations.  The government will have an opportunity to
present testimony if defendant files a separate motion to suppress the statements
he made to the officers at Enterprise.  See infra note 16.

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

defendant if he wanted to speak to them. Defendant asked for an attorney and

refused to waive his right to silence and his right to counsel. (Id. at 112-13; Gov't

Ex. 47.)[4] Shortly thereafter, the agents presented defendant with a document

stating:

> I, Aaron Douglas Knill, have been informed that I am entitled to be
> presented to the closest U.S. Magistrate on my arrest warrant and that
> the closest U.S. Magistrate is in Baltimore, Maryland.
>
> I have been advised that FBI Agents from Harrisburg, Pennsylvania,
> are available to return me to Harrisburg, Pennsylvania, tomorrow,
> January 19, 2007.
>
> I prefer to return to Harrisburg, Pennsylvania, and waive my right to
> be presented to a U.S. Magistrate in Baltimore, Maryland.

(Gov't Ex. 57.)[5] Defendant signed this document and was then taken to the

Frederick County Adult Detention Center. (Doc. 55 at 56, 115.)

During his time at the detention center, defendant appeared before a state

commissioner and was read a Request for Temporary Commitment document,

which stated that "there exists probable cause to believe that Aaron Douglas

Knill . . . violated Title 18 of the United States Code, Section 2113, i.e., bank

robbery." (Def. Ex. 2; Doc. 55 at 115-16.) The document also informed defendant of

---

[4] The exhibits referenced in this memorandum are those exhibits which were
received into evidence during the evidentiary hearing on May 4, 2007.
(See Docs. 51-53.)

[5] The government did not offer any testimony from the agents securing this
waiver from defendant. Defendant testified that the agents told him it would be
easier to see a magistrate judge in Harrisburg because seeing one in Baltimore
would involve being housed in the "Baltimore City supermax detention center
where they hold federal inmates." (Doc. 55 at 114.)

his right to remain silent and his right to counsel.  (Def. Ex. 2.)  Defendant was

ultimately transferred to a holding cell where, according to defendant, he attempted

to hang himself twice during the night with his shoe strings.[6]  (Doc. 55 at 116-17.)

On the morning of January 19, 2007, Agent Nawrocki and Agent Christopher

Bean traveled to the Frederick Police Department and spoke with Detective

Sergeant Bruce DeGrange ("Detective Sergeant DeGrange") about the previous

night's search of defendant's residence.  See infra Part II.B.  Detective Sergeant

DeGrange gave the agents photographs and the evidence seized during the search.

The agents then went to the detention center and took defendant in their custody.

(Doc. 55 at 56-57.)  During the hour and a half trip back to Harrisburg, the agents

did not question defendant about the Mid Penn Bank robbery or his whereabouts

on the prior day.[7]  (Id. at 58-59.)

Once in Harrisburg, the agents put defendant in the booking room.  (Id. at

61.)  After being given water and a granola bar, the following exchange between

Agent Nawrocki and defendant took place:

(1)     Agent Nawrocki asked defendant about the red marks on his neck and
        defendant responded:  "You know what they're from."  (Id. at 70.)
        Agent Nawrocki replied that he knew where the marks came from and
        advised defendant that he was not charged with a capital offense and
        would not face the death penalty.  (Id. at 69-70, 81, 118.)

---

[6] Defendant did not communicate to anyone at the detention center that he
had tried to commit suicide.  (Doc. 55 at 117.)  Nor did he inform the FBI agents
who transported him to Harrisburg of his suicide attempts.  (Id. at 70.)

[7] The agents were aware that defendant had invoked his right to counsel the
previous day.  (Doc. 55 at 59.)

(2)     Defendant then stated: "I'm worried about what's going to happen to me.  I'm wondering what's going to happen to me." (Id. at 61.)

(3)     Agent Nawrocki informed defendant that the agents could not speak with him about the case because defendant had invoked his right to counsel.  Agent Nawrocki then asked defendant if defendant was willing to talk with them and told defendant that he would re-advise defendant of his rights if defendant was willing to talk.  (Id. at 62.)

(4)     Agent Nawrocki indicated that defendant could help himself by speaking with the agents.  (Id. at 84.)

(5)     Defendant stated he was willing to talk and the agents re-advised him of his rights by reading a standard FBI Advice of Rights form.[8] (Id. at 62-63.)

---

[8] The FBI Advice of Rights form reads:

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decided to answer questions now without a lawyer present, you have the right to stop answering at any time.

I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present.

(Gov't Ex. 51.)

(6)     Defendant informed Agent Nawrocki that he waived his rights and was willing to speak with the agents.  He also signed the FBI Advice of Rights form.[9]  (Id. at 62, 64; Gov't Ex. 51.)

After waiving his rights, defendant asked about the charges against him. Agent Nawrocki told defendant that he was being charged with armed bank robbery.[10]  Then, over the course of forty-five minutes to an hour, the agents questioned defendant and defendant confessed to robbing the Mid Penn Bank and gave details about the robbery.[11]  (Doc. 55 at 65-66.)  Agent Nawrocki informed defendant that the employees of the bank were scared and that defendant could write an apology letter to them.  Defendant then wrote an apology letter to the bank's employees.  (Id. at 67; Gov't Ex. 52.)

## B.     Search of Residence

Detective Sergeant Bruce C. DeGrange ("Detective Sergeant DeGrange") of the Frederick Police Department became involved in this case after learning that other officers were detaining defendant at the local Enterprise rental agency. (Doc. 55 at 4, 9.)  Based upon information he received from the officers at Enterprise and officers who he sent to the residence, Detective Sergeant DeGrange

---

[9] Agent Nawrocki did not question defendant about the Mid Penn Bank robbery or his whereabouts on January 18, 2007 until defendant executed the waiver of rights form.  (Doc. 55 at 71.)

[10] Agent Nawrocki did not inform defendant that he was facing a twenty-five year mandatory minimum sentence.  (Doc. 55 at 85.)

[11] At no time during this interrogation did defendant communicate to Agent Nawrocki (or anyone else) that he no longer wanted to answer any questions or that he wanted a lawyer.  (Doc. 55 at 64-65.)

prepared an application for a search warrant.  (<u>Id.</u> at 11, 16.)  The application states,

in pertinent part:

> TO BE SEARCHED:  Single family rancher style residence and garage located at 1513 Rosemont Avenue, Frederick City/County Maryland. Further described as having a brick exterior and a single vehicle detached garage located behind the residence also with a brick exterior.
>
> ***
>
> On 11-18-07 at approximately 1130 hrs. an armed robbery occurred at the Mid-Penn Bank in Mechanicsburg, Pa.  A White male suspect entered the bank and produced a handgun.  The suspect demanded money from the employees of the bank.  The suspect escaped with approximately $5,900.00.  While exiting the bank, an eyewitness observed the suspect enter a late model, Black in color, Nissan Maxima automobile.  The vehicle displayed Maryland Registration 6CPA79.
>
> * * *
>
> Investigators working on the case found the vehicle in question was rented through Enterprise Car Rental in Frederick, Maryland.  *The subject who rented the vehicle is identified in their records as Aaron Douglas Knill*, W/M/03-29-78, *of 1513 Rosemont Avenue in Frederick, Maryland*.  At approximately 1700 hrs. this date, Knill attempted to return the overdue vehicle to Enterprise Car Rental . . . . Enterprise called the Frederick Police Department and officers responded to the business where Knill was detained.
>
> * * *
>
> This agency contacted the FBI and obtained a copy of a federal arrest warrant that was issued for Knill.  Knill was searched incident to arrest and found to be carrying a large amount of U.S. Currency on his person.  ($2,795.00)  It was also learned from Knill that he had returned to his residence prior to going to Enterprise Car Rental.  A search of the vehicle failed to yield any of the other evidence in this case.  It is believed that further evidence may have been placed in his residence.

8

(Gov't Ex. 48 (emphasis added)).  The Enterprise records, and defendant's driver's license, identify defendant's address as 931 Hamilton Blvd., Hagerstown, Maryland. (Def. Ex. 4.)  However, Detective Sergeant DeGrange had not seen the Enterprise records or defendant's license when preparing the application for a search, nor was he present at the rental agency.  He relied on the information provided by his officers.[12]  Detective Sergeant DeGrange was unaware of defendant's other addresses.  (Doc. 55 at 11, 18-19, 22, 45-48.)

Detective Sergeant DeGrange also prepared the actual search warrant, which states, in relevant part:

> To:  D/Sgt. B.C. DeGrange, or any officer of the Frederick Police Department
>
> Based on the Application of D/Sgt. B.C. DeGrange . . .
>
> which is incorporated herein and made part hereof by reference, I find there exists probable cause to authorize a Search and Seizure as follows:

---

[12] Officer Ed Hanner told Detective Sergeant DeGrange that he received the address information verbally from defendant at Enterprise.  (Doc. 55 at 19-20.)  Officer Hanner's notes—regarding his initial discussion with defendant—contain the 1513 Rosemont Avenue address.  (Gov't Ex. 59.)  Although hearsay, Officer Hanner's statement and notes are admissible at the motion to suppress stage.  See United States v. Hubbard, 269 F. Supp. 2d 474, 479 (D. Del. 2003) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." (quoting United States v. Raddatz, 447 U.S. 667, 679 (1980))).  Most importantly, defendant acknowledges that he gave officers the 1513 Rosemont Avenue address.  (Doc. 61 at 21 n.7 ("[W]hile it is not clear where the address of 1531 [sic] Rosemont Avenue was obtained, it was obtained through interrogation . . . .")).

1.  Within the next fifteen (15) days, you, or any officer of the Frederick Police Department, are commanded with the necessary and proper assistance, to search the:

for the evidence of:  <u>Armed Bank Robbery</u> . . . .

(Gov't Ex. 49.)  The location of the place to be searched was left blank on the search warrant by mistake.  (Doc. 55 at 26.)  Detective Sergeant DeGrange prepared three packets of the search warrant paperwork.  Each packet contained the search warrant itself, the application for the warrant, and the oath of Detective Sergeant DeGrange.[13]  (Doc. 55 at 12-13, 28; Gov't Exs. 48-49.)  Detective Sergeant DeGrange took the three packets to the residence of Circuit Court Judge Julie S. Solt, who signed the documents at 10:34 p.m.  (Doc. 55 at 23-24, 27.)

At approximately 11:05 p.m., Detective Sergeant DeGrange and other law enforcement officials went to the residence to conduct the search, which lasted approximately one hour.  The officials found a black duffel bag in a crawl space off of the master bedroom upstairs.  They also found a lock box with a large amount of U.S. currency, a handgun, extra ammunition for the handgun, a portable police scanner with a digital watch strapped to it, gloves, and what appeared to be something that could have been used as a mask.  (<u>Id.</u> at 27-28.)  Except for the law

---

[13] The judge who signed the materials kept one packet.  Another packet was given to the FBI for its files.  The final packet was put on the kitchen counter of the place searched because no one was at the residence when the search began. (Doc. 55 at 28.)

enforcement officials, no one else was present during the search.  Defendant's father arrived at the residence just before the search finished.  (Id. at 28-29.)

Approximately an hour and a half before serving the search warrant and conducting the search, Detective Sergeant DeGrange sent two detectives to secure the residence in preparation for obtaining the search warrant.  (Id. at 30.) Thereafter, these detectives gave Detective Sergeant DeGrange a physical description of the exterior of the residence and advised him that they had encountered David Bell[14] inside the residence and had checked for any outstanding warrants on Mr. Bell.  (Id. at 51.)

## II.   **Discussion**

The instant motion seeks to suppress defendant's oral and written statements and the evidence obtained during a search of his residence.  Defendant argues that because his oral statements to the officers at the Enterprise rental agency were taken in violation of Miranda, the evidence retrieved at his residence must be suppressed as fruit of the poisonous tree.  He also contends that his oral and written statements were obtained in violation of the Fifth Amendment because the law enforcement officials continued their interrogation after he had already invoked his right to counsel.  Defendant further argues that the search of his residence was invalid because of an earlier warrantless search of the residence and a defective search warrant.  These issues will be addressed *seriatim*.

---

[14] David Bell was hired to paint a portion of defendant's residence.  (Doc. 55 at 105.)

A.    **Oral and Written Statements**

1.    **Statements at Enterprise Rental Agency**

Defendant seeks the suppression of the oral statements made to the officers

at the Enterprise rental agency and the fruit of such statements (i.e., the physical

evidence obtained during the search of his residence).  Defendant contends that he

was in custody and interrogated and was not given <u>Miranda</u> warnings prior to

answering questions regarding his address and his whereabouts during the day.

Ostensibly, the government was unaware that defendant sought suppression of

these statements and alleged fruit thereof,[15] and, consequently, it did not offer any

testimony during the suppression hearing from the officers who encountered

defendant at Enterprise.  Therefore, the court cannot determine at this juncture

whether defendant was in custody and subject to custodial interrogation at the time

the statements were made.  To the extent these statements remain an issue in the

case, the court will defer ruling on their admissibility.[16]

---

[15] In the instant motion, defendant merely mentions that no <u>Miranda</u>
warnings were given to defendant at Enterprise (<u>see</u> Doc. 27 ¶ 3) and only a single
paragraph in his brief in support of the motion discusses this issue, *sans* any
citation to applicable legal authority (<u>see</u> Doc. 28 at 7).  Notably, defendant's
proposed order for the instant motion does not specifically seek the suppression of
the oral statements made at Enterprise.  (Doc. 27-7 (requesting that "the motion to
suppress evidence seized from the Defendant's residence on January 18, 2007, and
the statements made in the form of a confession by the Defendant on January 19,
2007" be granted and such evidence be suppressed)).

[16] If defendant seeks the suppression of these oral statements, he may file a
separate motion to suppress.  Before filing a separate motion, defendant shall
confer with the government to determine whether the government intends to
introduce these statements at trial.

Even if these oral statements are inadmissible at trial, the physical evidence obtained during the search of defendant's residence is not automatically inadmissible as fruit of these statements. Such evidence is admissible if defendant's statements to the officers were voluntary. See United States v. Latz, No. 04-3952, 2005 WL 3529322, at *4 (3d Cir. Dec. 27, 2005) ("[T]he Fourth Amendment does not require suppression of physical evidence discovered as a result of unmirandized but voluntary statements." (citing United States v. DeSumma, 272 F.3d 176, 180-81 (3d Cir. 2001))); see also United States v. Patane, 542 U.S. 630 (2004). A statement is considered involuntary when the defendant's "will was overborne in such a way as to render his confession the product of coercion." Latz, 2005 WL 3529322, at *4 (quoting Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002)). Determining whether statements were involuntary depends on "the totality of the circumstances in which they were made." Id.

In the instant case, even without the benefit of testimony from the officers who encountered defendant at the Enterprise rental agency, the court finds that the statements made by defendant at Enterprise were voluntary and not the product of coercion. According to defendant, he was led to believe that the officers were present because of an overdue payment on the rental vehicle. The only other law enforcement action undertaken by the officers was the standard directive to ask those in the immediate vicinity to leave the area. Such tactics do not amount to coercion. There is no evidence that the officers held or pointed weapons during their questioning. Nor is there any evidence that the officers otherwise threatened

13

defendant or used physical force.  See id.; DeSumma, 272 F.3d at 178.  Given

defendant's testimony regarding his time at Enterprise, the court finds that his

statements were voluntary and not coerced.  Therefore, the court will deny the

motion to suppress the evidence obtained during the search of defendant's

residence as fruit of the statements made at the Enterprise rental agency.[17]

---

[17] Defendant argues that the alleged Miranda violation, ordinarily a Fifth
Amendment violation, is akin to a Fourth Amendment violation in this case in the
sense that it taints the subsequent search.  In essence, defendant contends that his
pre-Miranda statements were used illegally to obtain a search warrant and,
consequently, the physical evidence retrieved during the search is the fruit of the
poisonous tree.  See Segura v. United States, 468 U.S. 796, 804 (1984) ("[T]he
exclusionary rule reaches not only primary evidence obtained as a direct result of
an illegal search or seizure, but also evidence later discovered and found to be
derivative of an illegality or 'fruit of the poisonous tree.'").  The court is
unpersuaded.  That defendant's statements led to the issuance of a search warrant
is immaterial.  See, e.g., United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir.
2006).  As the Supreme Court stated:  "[T]he Miranda rule is a prophylactic
employed to protect against violations of the Self-Incrimination Clause. . . . [T]he
core protection afforded by the Self-Incrimination Clause is a prohibition on
compelling a criminal defendant to testify against himself at trial. . . . The Clause
cannot be violated by the introduction of nontestimonial evidence obtained as a
result of voluntary statements."  Patane, 542 U.S. at 636-37.  Using statements to
obtain a search warrant does not compel defendant to testify against himself at trial
and, therefore, does not require the suppression of the evidence found pursuant to
the warrant.
    Defendant also contends that the fruit of the poisonous tree doctrine should
apply because the Supreme Court in Dickerson v. United States, 530 U.S. 428
(2000), held that Miranda was a constitutional decision.  (Doc. 61 at 23.)  This
contention is without merit as it disregards the Supreme Court's subsequent
analysis in Patane, stating that "nothing in Dickerson, including its characterization
of Miranda as announcing a constitutional rule, changes any of" the Court's
observations.  Patane, 542 U.S. at 640 (holding that a Miranda violation does not
require the suppression of physical evidence obtained as a result of unwarned but
voluntary statements).

## 2. <u>Statements the Day After Defendant's Arrest</u>

Before the police question a suspect, they "must inform the suspect of his right to remain silent and his right to have counsel present during interrogation." <u>United States v. Velasquez</u>, 885 F.2d 1076, 1084 (3d Cir. 1989) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 468-70 (1966)). If a suspect invokes his right to counsel, questioning by the police must cease "until counsel has been made available to [the suspect], unless the suspect himself initiates further communication, exchanges, or conversations with the police." <u>Id.</u> (quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981)). Two factors are required before the police may interrogate a suspect who has invoked his right to counsel:

> First, the suspect must initiate the conversation with the authorities, not vice versa.
>
> Second, after the suspect initiates the conversation, the waiver of the right to counsel and the right to silence must be knowing and voluntary.

<u>Id.</u> (citing <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1045-46 (1983)).

In the matter *sub judice*, there is no dispute that defendant invoked his right to counsel and that the next day, without a lawyer present, he confessed and wrote an apology letter to the bank employees. The parties dispute who initiated the discussion that led to the confession and apology letter and whether defendant's waiver of rights was knowing and voluntary.

a.    **Initiation Requirement**

Defendant contends that by asking him about the red marks on his neck,

Agent Nawrocki initiated the conversation that led to his confession and apology

letter.  Only if this question constituted interrogation will Agent Nawrocki be

considered to have initiated the conversation.  United States v. Silknitter, No. 1:05-

CR-0423, 2006 WL 860064, at *4 (M.D. Pa. Apr. 3, 2006).  Whether statements,

questions, or practices constitute interrogation "depends on the circumstances of

each case, particularly whether the statements are objectively and reasonably likely

to result in incriminating responses by the suspect, as well as the nature of the

police statements and the context in which they are given."  Id. (citing United

States v. Allen, 247 F.3d 741, 765 (8th Cir. 2001), vacated and remanded on

unrelated sentencing grounds, and cited with approval in United States v. Oppong,

No. 03-4112, 2006 WL 197162, at *4 (3d Cir. Jan. 26, 2006)).

In the instant matter, the court finds that Agent Nawrocki's inquiry

regarding the red marks on defendant's neck do not constitute interrogation.  In

context and based upon the court's analysis of the applicable testimony, the court

finds that this question was both an expression of concern and an attempt to

ascertain whether defendant intended to harm himself.  Merely asking where the

marks came from and then informing defendant that he was not charged with a

capital offense and would not face the death penalty are not objectively nor

reasonably likely to elicit an incriminating response from defendant.  These

questions and statements clearly did not involve the previous day's alleged criminal

16

activity.  And, even if Agent Nawrocki's motive was to develop a rapport with

defendant, Agent Nawrocki could not have known that this conversation would lead

an incriminating response.  See United States v. Innis, 446 U.S. 291, 301 (1980)

(stating that the "definition [of interrogation] focuses primarily upon the

perceptions of the suspect, rather than the intent of the police"); see also United

States v. Brownlee, 454 F.3d 131, (3d Cir. 2006) ("The intent of the officer . . . may

bear on the question of 'whether the police should have known that their words or

actions were reasonably likely to evoke an incriminating response.'").  Indeed, this

conversation regarding the marks on defendant's neck did not include any threats

or pressure, nor did it constitute a plea to defendant's conscience.  See Silknitter,

2006 WL 860064, at *5 ("As long as such statements are not accompanied by any

'threats or other compelling pressure' or in a manner that constitutes a 'plea to

conscience,' they do not amount to interrogation.").  Accordingly, the court finds

that Agent Nawrocki's conversation regarding the marks on defendant's neck was

not interrogation and, therefore, not initiation.

Following this conversation, defendant stated:  "I'm worried about what's

going to happen to me.  I'm wondering what's going to happen to me."  (Id. at 61.)

The court finds that this statement satisfies the initiation requirement (i.e.,

defendant initiated the conversation with the authorities).  Defendant's statement

clearly "evinc[ed] a willingness and a desire for a generalized discussion about the

investigation."  Valesquez, 885 F.2d at 1085 (adopting the plurality view in Oregon v.

Bradshaw, 462 U.S. 1039 (1983), of when initiation by a suspect occurs); see id.

17

(finding the initiation requirement satisfied when the defendant asked the authorities, "What is going to happen?"); see also Bradshaw, 462 U.S. at 1045 ("There can be no doubt in this case that in asking, "Well, what is going to happen to me now?", [the defendant] 'initiated' further conversation . . . .").

### b.   Waiver Requirement

Finding that defendant initiated the conversation does not end the court's inquiry.  The court must now determine whether defendant's waiver of his right to counsel and right to silence was knowing and voluntary.  See Valesquez, 885 F.2d at 1084.  This determination depends on the "totality of the circumstances . . . including the background, experience, and conduct of the [defendant]."  Id. at 1086. It is the government's burden to prove by a preponderance of the evidence that the waiver was knowing and voluntary.  See id.

In the matter *sub judice*, the court finds that defendant's waiver was knowing and voluntary.  Agent Nawrocki re-read defendant his rights[18] and defendant subsequently signed the Advice of Rights form.  (Doc. 55 at 64; Gov't Ex. 51.) Defendant clearly understood his rights because he had invoked his right to silence and right to counsel the previous night.  See Valesquez, 885 F.2d at 1087.  He also understood his rights from a prior prosecution.  (Doc. 55 at 124-25.)  During the evidentiary hearing on the instant motion, defendant acknowledged that "at the time [he] decided to waive [his] rights, [he] knew what [he was] doing . . . [and]

---

[18] Defendant was apprised of his Miranda rights on two previous occasions. (See Gov't Ex. 47; Def. Ex. 2; Doc. 55 at 113, 115, 124.)

18

understood what [the agents] were asking [him] to do." (Id. at 128.) Therefore, the court finds that defendant's waiver was knowing and intelligent.

Defendant's waiver was also voluntary because "it was the product of a free and deliberate choice rather than intimidation, coercion or deception." Valesquez, 885 F.2d at 1088. The record is devoid of any evidence that the agents intimidated or coerced defendant between the time he initiated the conversation about his case and the time he waived his rights. The only evidence potentially supporting a claim that defendant's waiver was involuntary is Agent Nawrocki's statement to defendant that defendant could help himself by speaking with the agents. (Doc. 55 at 84.) Even if this statement was inaccurate or made with the intent to deceive, it does not automatically transform defendant's waiver into an involuntary one. See Valesquez, 885 F.2d at 1088 ("[L]ies told by the police do not necessarily make a confession involuntary; rather, this is simply one factor to consider out of the totality of the circumstances."). Defendant did not waive his rights immediately following Agent Nawrocki's statement. After making this statement, Agent Nawrocki advised defendant of his rights by reading defendant the Advice of Rights form. Regardless of Agent Nawrocki's statement that defendant could help himself by speaking with the agents, defendant knew from the Advice of Rights form that any statements he made could be used against him. (See Gov't Ex. 51 ("Anything you say can be used against you in court."). And, defendant testified that he waived his rights voluntarily. (See Doc. 55 at 128.) Accordingly, the court finds that defendant's waiver was voluntary.

19

Given the circumstances of this case, the court finds that the government has demonstrated by a preponderance of the evidence that defendant's waiver was knowing and voluntary.[19]  Although defendant invoked his right to counsel on the day of his arrest, his initiation of the conversation regarding his case the following day and subsequent knowing and voluntary waiver of his rights permitted the agents to interrogate him about the Mid Penn Bank robbery.  Therefore, the court will deny defendant's motion to suppress his confession and letter of apology on this ground.

### c.   Rule 5

Defendant argues that a violation of his rights under Rule 5 of the Federal Rules of Criminal Procedure warrants suppression of his confession and apology letter.  The court disagrees.  Rule 5 provides:  "A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides." Fed. R. Crim. P. 5(a)(1)(A).  A confession obtained during an "unnecessary delay" is inadmissible.  See United States v. Corley, No. 03-775, 2004 WL 1102367, at *1 (E.D. Pa. May 10, 2004) (citing McNabb v. United States, 318 U.S. 332 (1943) and Mallory v. United States, 354 U.S. 449 (1957)).  As to the location of the initial appearance,

---

[19] Defendant's suicide attempts the night before do not change the court's analysis.  There is no evidence that defendant's mental state at the relevant time impaired his ability to waive his rights knowingly and voluntarily.  Agent Nawrocki testified that defendant was not crying or excited during this time.  (Doc. 55 at 64.) Defendant agreed with this characterization and stated that he was calm.  (Id. at 128.)

Rule 5 provides, in pertinent part: "If the defendant was arrested in a district other than where the offense was allegedly committed, the initial appearance must be: (A) in the district of arrest; or (B) in an adjacent district if . . . the appearance can occur more promptly there . . . ." FED. R. CRIM. P. 5(c)(2).

In the matter *sub judice*, defendant contends that his initial appearance the day after his arrest[20] should have been in Baltimore, Maryland—the district of arrest. The government argues that Harrisburg was an appropriate location because transporting defendant from Frederick to Harrisburg was equally, if not more, expeditious than transporting him to Baltimore. See id. 5(c)(2)(B)(i). The court recognizes that the distance between Frederick and Harrisburg is approximately twenty miles greater than the distance between Frederick and Baltimore. However, the court finds that incontrovertible traffic issues surrounding the Baltimore/Washington area result in no material difference in the commute time to Harrisburg over Baltimore. In light of the purposes of Rule 5 to ensure a defendant's prompt appearance before a magistrate judge,[21] it is clear that the

---

[20] Defendant does not contend that he should have been taken before a magistrate judge the night of his arrest.

[21] See Coyote v. United States, 380 F.2d 305 (10th Cir. 1967) ("The manifest purpose of [Rule] 5(a) is to make sure that an accused person is fully advised of his constitutional rights by a judicial officer–not an enforcement officer–before he makes any incriminating statement." (citing Mallory v. United States, 354 U.S. 449 (1957))). The court notes that in the instant case, defendant was advised of the nature of the charges against him and informed of his rights by a judicial officer at the Frederick County Adult Detention Center on the night of his arrest. (Def. Ex. 2; Doc. 55 at 115-16.)

spirit, if not the letter, of the Rule was satisfied in this case.  Even if a technical

violation of Rule 5(c)(2) occurred, the court finds that the law enforcement officials

took defendant before a magistrate judge "without unnecessary delay."[22]  <u>Id.</u>

5(a)(1)(A).  Therefore, suppression of defendant's confession and apology letter is

not warranted.  Accordingly, the court will deny the motion to suppress on this

ground.

### B.    **Evidence Obtained During Search of Residence**

Defendant contends that the evidence seized during a search of his residence

should be suppressed because of:  (1) a warrantless, previous search of the

residence and (2) a defective search warrant.

### 1.    **Warrantless, Previous Search of Residence**

Defendant argues that, contrary to the government's assertion that the

detectives initially went to defendant's residence solely to secure it, the detectives

conducted an illegal, warrantless search.  Thus, defendant contends, the evidence

seized during the second search pursuant to the search warrant should be

suppressed as fruit of the poisonous tree.  Assuming, *arguendo*, that the detectives

conducted an illegal search, defendant's argument fails because of the independent

source doctrine.  Under the independent source doctrine, "evidence that was in fact

discovered lawfully, and not as a direct or indirect result of illegal activity, is

---

[22] The court need not determine if defendant waived his Rule 5 rights by signing the waiver document (Gov't Ex. 57) the night of his arrest because the court finds that there was no material violation of Rule 5.

admissible." <u>United States v. Sobolewski</u>, No. 05-3014, 2007 WL 931421, at *2 (3d

Cir. Mar. 29, 2007) (quoting <u>United States v. Herrold</u>, 962 F.2d 1131, 1140 (3d Cir.

1992)); <u>see also</u> <u>Murray v. United States</u>, 487 U.S. 533, 542 (1988) ("So long as a later,

lawful seizure is genuinely independent of an earlier, tainted one . . . there is no

reason why the independent source doctrine should not apply.").  This doctrine

ensures that law enforcement is not put "in a worse position than they would have

been in absent any error or violation." <u>Id.</u> at 537.

In the matter *sub judice*, the record is devoid of any evidence that the search

warrant was tainted by the detectives' earlier alleged search of the residence.

Detective Sergeant DeGrange did not pursue the search warrant as the result of

information provided by the detectives who were securing the residence.  <u>See</u> <u>id.</u> at

542 (stating that the independent source doctrine would not apply "if the agents'

decision to seek the warrant was prompted by what they had seen during the

initial" illegal entry"); <u>see also</u> <u>Sobolewski</u>, 2007 WL 931421, at *2 (stating that

evidence obtained pursuant to a lawful warrant "is admissible if . . . the 'officers

were not prompted to obtain the warrant by what they observed during'" and initial

illegal search).  To the contrary, these officers did not communicate any information

to Detective Sergeant DeGrange regarding the contents of defendant's residence.

Indeed, the search warrant and application prepared by Detective Sergeant

DeGrange are devoid of any reference to any information obtained from these

detectives, except for the physical description of the exterior of defendant's

residence.[23]  See id. ("If a lawful warrant is obtained subsequent to the initial illegal

search or entry, then the evidence is admissible if the warrant is based on probable

cause *other than facts tainted by the initial illegal act* . . . ." (emphasis added)).

Therefore, the court finds that the independent source doctrine applies to the

search conducted pursuant to the search warrant.  Accordingly, the court will deny

the motion to suppress on this ground.

### 2.   Defective Search Warrant

#### a.   Materially False Information and Omissions

Defendant contends that materially false information and omissions from the

application for the search warrant render the search warrant invalid and, therefore,

the evidence found at his residence should be suppressed.  Defendant identifies the

following emphasized text as the false information on the application for the search

warrant:  "The subject who rented the vehicle *is identified in [Enterprise's] records*

as Aaron Douglas Knill . . . *of 1513 Rosemont Avenue in Frederick, Maryland.*"

(Gov't Ex. 48 (emphasis added); Doc. 66 at 6-7.)  He identifies his other addresses as

the material omissions.  (Doc. 66 at 7.)  There is no dispute that the 1513 Rosemont

Avenue address did not come from Enterprise's records or that defendant had

---

[23] Defendant does not argue that the Judge Solt did not have "a substantial
basis for . . . concluding that probable cause existed" for the search based on the
application as prepared by Detective Sergeant DeGrange.  Illinois v. Gates, 462 U.S.
213, 238-39 (1983) (citations omitted); see also United States v. Whitner, 219 F.3d
289, 296 (3d Cir. 2000).  Instead, defendant contends that the false information
should be removed from the application and that without this information, probable
cause is lacking.  See infra Part II.B.2.

multiple addresses.  Suppression is warranted, however, only if defendant demonstrates by a preponderance of the evidence "(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination."  United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006); see also United States v. Shields, 458 F.3d 269, 276 (3d Cir. 2006); United States v. Hall, No. 3:05-CR-176, 2006 WL 1274720, at *4 (M.D. Pa. May 4, 2006).

In that matter *sub judice*, the court finds that defendant has not met his burden with respect to either prong.  With respect to the first prong, the affiant—Detective Sergeant DeGrange—did not knowingly, deliberately, or with reckless disregard provide false statements or omissions in the application for the search warrant.  Detective Sergeant DeGrange testified that he (1) relied on the information provided by the officers on the scene at Enterprise, (2) was unaware of defendant's other addresses at the time he prepared the application, and (3) believed that the 1513 Rosemont Avenue address derived from the records at Enterprise.[24]  (Doc. 55 at 11, 18-19, 22, 45-48.)  Given this testimony, which was not

---

[24] Detective Sergeant DeGrange testified that he did not think that defendant's multiple addresses were "germane to the application" because defendant lived at 1513 Rosemont Avenue.  (Doc. 55 at 46.)  This statement, however, was not an admission that he was aware of the multiple addresses at the time he prepared the application for the search warrant.

refuted by defendant,[25] the court finds that defendant has not demonstrated by a preponderance of the evidence that Detective Sergeant DeGrange knowingly, deliberately, or with reckless disregard made false statements or omissions on the application for the search warrant.

Even if defendant satisfied the first prong, the court finds that the false information and omissions were not material to the probable cause determination. When determining whether an application of probable cause is sufficient to satisfy the requirements of the Fourth Amendment, a reviewing court must "ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39 (1983) (citations omitted); see also Shields, 458 F.3d at 277. When false information or omissions are included in the application, "the [application] may nevertheless support a valid warrant if information contained in the [application], independent of the defective portion, supports a probable cause finding." United States v. Conley, 4 F.3d 1200, 1208 n.7 (3d Cir. 1993).

In the instant case, the application for the search warrant had a substantial basis for concluding that probable cause existed even excluding the false information. Defendant argues that the false information includes the actual 1513 Rosemont Avenue address and, therefore, the application did not provide probable

---

[25] Defendant did not call any of the law enforcement officials who were present at Enterprise to testify as to what they communicated to Detective Sergeant DeGrange.

cause to search this location.  However, there is no dispute that defendant lived at this address.  Therefore, the court concludes that the only false information in the application is the *source* of the address (i.e., the portion of the application that reads "identified in [Enterprise's] records" (Gov't Ex. 48)), not the address itself.  Excising the source of the address from the application does not remove probable cause to search defendant's residence at 1513 Rosemont Avenue.

Likewise, adding the omitted material—defendant's multiple addresses—to the application does alter the court's probable cause analysis.  While these addresses may provide probable cause to search other locations, they do not remove the probable cause to search the residence at 1513 Rosemont Avenue.  Detective Sergeant DeGrange testified that if he had put another address on the application, he would have noted that defendant's residence was 1513 Rosemont Avenue.  (Doc. 55 at 48.)  In addition, the application states that "[i]t was also learned from Knill that he had returned to his residence prior to going to Enterprise Car Rental.  A search of the vehicle failed to yield any of the other evidence in this case.  It is believed that further evidence may have been placed in his residence."  (Gov't Ex. 48.)  Therefore, adding defendant's multiple address would not remove probable cause from the search warrant.  Accordingly, the court will deny the motion to suppress on this ground.

### b.   Premises to Be Search Not on Actual Warrant

Defendant also argues that the search warrant was defective because the actual warrant did not describe the premises to be searched.  (Doc. 27 at 5.)

27

Defendant agrees that this issue can be cured if the application for the warrant identifies the location to be searched and the application is incorporated into the warrant.  (Doc. 66 at 6); see United States v. $92,422.57, 307 F.3d 137, 158 (3d Cir. 2002) ("[W]here an affidavit is incorporated by reference into the warrant, the affidavit can cure the warrant's lack of particularity." (citing United States v. Johnson, 690 F.2d 60, 64 (3d Cir. 1982)); see also United States v. Curry, 911 F.2d 72, 77 (8th Cir. 1990).  This is precisely the situation in the instant case.  The warrant states that the application "is incorporated herein and made part hereof by reference" (Gov't Ex. 49) and the application specifically describes the location to be searched (Gov't Ex. 48).  In addition, the application always accompanied the warrant, including when officers took the packet of warrant documents to defendant's residence.  See Curry, 911 F.2d at 77 (providing that a supporting affidavit can cure a deficient warrant only if "the affidavit accompanies the warrant").  Accordingly, the court will deny the motion to suppress on this ground.

## III.   Conclusion

For the foregoing reasons, the court will deny the motion to suppress.  An appropriate order will issue.

  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:       June 29, 2007

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:07-CR-0029** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **AARON DOUGLAS KNILL** | : | |

## <u>ORDER</u>

AND NOW, this 29th day of June, 2007, upon consideration of defendant's motions to suppress evidence (Doc. 27), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 27) is DENIED.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge